# IN THE MATTER OF MARY MOE.

No. 91-P-1150.

Plymouth. September 26, 1991. - October 16, 1991.

Present: BROWN, DREBEN, & IRELAND, JJ.

*Abortion. Probate Court*, Incompetent person. *Guardian*, Incompetent person. *Incompetent Person*, Consent to medical treatment.

Statement of the doctrine of substituted judgment as applicable to the case of a guardian seeking authorization to give consent for the ward to have an abortion. [476-478]

The findings and rulings of a Probate Court judge did not support her determination that a ward, whose guardian sought authorization to give consent for an abortion, was not competent to make her own decision in the matter. [478-479]

A Probate Court judge incorrectly denied the petition of a guardian seeking authorization to give consent for her ward to have an abortion, where the judge, in applying the substituted judgment analysis, gave inadequate weight to the preference of the ward and incorrectly relied on the absence of a compelling medical reason as the basis for her decision. [479-480]

PETITION filed in the Plymouth Division of the Probate and Family Court Department on August 30, 1991.

The case was heard by *Catherine P. Sabaitis*, J.

*David Norris* for the petitioners.

*Kathleen J. Wood* for the ward.

*C. Michele Dorsey*, guardian ad litem.

DREBEN, J. Petitioner is the mother and one of the two guardians of her mentally retarded adult daughter.[1] On August 30, 1991, she petitioned the Probate Court seeking authorization to give consent for the ward to have an abortion and to be sterilized by a tubal ligation. After a hearing and the subsequent submission of medical reports, a probate

---

[1]The other guardian, petitioner's husband, is the ward's father. Cf. *Phelan* v. *McCabe*, 343 Mass. 585, 587-588 (1962).

judge, on September 25, 1991, denied the portion of the petition which sought an abortion, but preserved the right to have a further hearing on the issue of sterilization.[2]

The guardian and her ward (for whom counsel and a guardian ad litem had been appointed) appealed from that order. On September 26, 1991, after reviewing the papers, listening to a tape recording of the colloquy between the judge and the ward, and after hearing argument from counsel for the guardian, counsel for the ward, and the guardian ad litem,[3] the panel entered an order, with opinion to follow, reversing the order of the probate judge and requiring the entry forthwith of an order in the Probate Court authorizing the guardian to consent to an abortion. This is our explanation of the September 26, 1991, order.

We set forth the facts contained in the judge's "Findings and Order" and, on occasion, quote directly from her findings. The order contained twelve headings which were the factors considered by the judge.[4]

---

[2]We treat the order denying authorization to consent to an abortion as a final order. The appeal would be futile unless the order could be reviewed by the prompt entry of an appeal. See *Borman* v. *Borman*, 378 Mass. 775, 778-780 (1979).

[3]The guardian ad litem had originally filed a report assenting to the petition. On the same day that the judge entered her order, but subsequent thereto, the guardian ad litem filed a motion to strike her report and to withdraw her assent to the petition on the ground that she had learned that the ward was now eighteen and one-half weeks pregnant and that medical information was supplied to the court addressing the ward's current medical situation which the guardian ad litem had not seen. For this reason she did not have enough information to file a report or to assent to the petition. The judge allowed the motion. At oral argument on appeal, the panel recessed to give the guardian ad litem an opportunity to examine the medical records. After the recess, the guardian ad litem was asked if she wished to comment. She stated that she only was able to look at the reports hastily, but she was reassured by them as they did not contain anything which would change her original opinion. In the view which we take of the case, we do not rely on the guardian ad litem's report, which was not before us, or on her oral statements to the panel.

[4]The twelve headings were: (1) Extent of Ward's Impairment; (2) Whether the Ward is in State Custody; (3) Prognosis with Proposed Treatment; (4) Prognosis without Proposed Treatment; (5) Complexity, Risk, and Novelty of Proposed Treatment; (6) Possible Side Effects of Treatment; (7) Ward's Level of Understanding and Probable Reaction; (8)

In the Matter of Moe.

The ward at the time of the judge's order and findings, as amended, was nineteen and a half weeks pregnant. She was twenty-four years old and was pregnant for the fifth time. She had had three abortions[5] and is the mother of a twenty month old daughter. She is divorced.

"The ward has already been determined to be incompetent and in need of guardianship due to her mental retardation. She has 'borderline cognitive function' with an IQ of around high 70/low 80s. She is not competent to make the decisions on the proposed procedure." The only other findings concerning the ward's level of understanding were: "Having had abortions before, with some unpleasant memories of same, the ward has some familiarity, through experience, with the procedure. She has said she wants an abortion. At the time of the hearing, she was not aware of how far along in her pregnancy she was. Her understanding and judgment are minimal. She is best described as child-like. Her judgment is immature. She tends to be passive and dependent."

The ward suffers from colitis and takes medication for seizures, "which, it was represented, could lead to birth defects in the fetus. Failure to take the medication could put the ward at risk, as her seizures tend to increase during pregnancy."

"The ward, who also addressed the [Probate] Court in the presence of her attorney, has clearly stated that she wants to have an abortion. Her rationale is that she does not want, nor could she handle, any more children. She presently lives with her parents, upon whom she depends heavily for help and support in caring for her young daughter. . . . "

The prognosis of the proposed treatment is excellent; without it, "[i]t is possible, although the likelihood cannot be predicted, that the ward's colitis and seizure disorder could be exacerbated during pregnancy, with some risk to the ward

Urgency of Decision; (9) Consent of Guardian and Impact upon the Ward's Family; (10) Preference of the Ward; (11) Religious Convictions of the Ward; (12) Professional Opinion and Recommendation.

[5]At oral argument counsel for the guardian stated that one abortion was without the knowledge of the guardian and two were before the appointment of the guardian.

due to side effects of treatment. However, a normal, healthy baby is anticipated. . . . It is unlikely, except for the temporary physical discomfort she may experience, that she will have any long-term effects from the abortion."

No evidence of any religious convictions of the ward which would affect the decision was presented.

Referring to the medical plan for the abortion proposed by Dr. Nadel (a specialist in maternal fetal medicine), the judge found that "Dr. Nadel concluded that there [were] no compelling medical indications for termination of the pregnancy from either the maternal or fetal perspective. Medication taken by the ward has an adverse effect on a fetus in a minority of cases."

After the foregoing findings, and immediately after the finding concerning Dr. Nadel, the judge wrote a concluding paragraph which in its entirety (except for preserving petitioner's right to an additional hearing on the issue of sterilization) was as follows:

"Because there are no compelling medical reasons for the abortion from either the maternal or fetal standpoint, and given the weight of the evidence to the other facts considered above, the Court cannot state with clarity that it would be the ward's substituted judgment to assent to the recommended treatment, i.e., abortion. The petition, insofar as it requests authority to consent to an abortion, is denied."

The judge's ruling denying the guardian's petition discounts the clear preference of the ward and appears to be based on the lack of a compelling medical reason for an abortion.

The case was tried in the Probate Court on the assumption that the judge was to apply the doctrine of substituted judgment.[6] For purposes of this appeal, we also analyze the case on that basis.

---

[6]After the judge's decision, the petitioner moved for reconsideration in the Probate Court arguing that in the case of an abortion, as contrasted

The most instructive case for such an analysis is *Matter of Moe*, 385 Mass. 555 (1982), which involved the right of sterilization for a mentally retarded person. The Supreme Judicial Court held that the personal decision whether to bear or beget a child is a right so fundamental that it must be extended to all persons, including those who are incompetent. *Id.* at 563-564. This is to be accomplished through the doctrine of substituted judgment. *Id.* at 565. See *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 750, 752 (1977). Central to that doctrine is the recognition that the judge is not to make what is necessarily "the best decision"[7] but rather is to make the "decision [that] would be made by the incompetent person if he or she were competent." *Moe*, 385 Mass. at 565. "The courts thus must endeavor, as accurately as possible, to determine the wants and needs of this ward as they relate to [the abortion] procedure." *Id.* at 566.

Prior to substituting judgment, the judge must as a threshold matter determine on the basis of the evidence adduced at a hearing, with the aid of medical and psychological experts, if appropriate, whether the ward, "despite being mentally retarded, is able to make an informed choice" as to the procedure. *Id.* at 567. If the ward can make that decision, her choice controls. Only if the ward is determined to be incompetent to make the decision is a substituted judgment to be made.

If the judge finds that the ward is incompetent to make the choice, he or she must make "specific findings" to establish that fact. *Id.* at 568 n.8. Even if the ward is found incompetent to make the decision, the ward's actual preference "is an

---

with a sterilization, the doctrine of substituted judgment is inapplicable and the decision of the guardian should control. Since the case was not presented to the judge on this basis prior to her decision, and since we, in any event, reach the result sought by the guardian, we do not consider the argument. We in no way suggest, however, that court approval is required, particularly in those circumstances where the guardian and the ward agree as to the decision.

[7] We note that the ward's treating neurologist in his report to the court stated categorically that "[i]t is in [the patient's] best interest, from a neurologic standpoint, to have termination of the pregnancy."

important part of the substituted judgment determination. The result of the judge's exercise of discretion should be the same decision which would be made by the incompetent person, 'but taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person.' " *Id.* at 570, quoting from *Saikewicz, supra* at 752-753.

In our view, the judge was too quick in finding that the ward lacked competence to decide whether to have an abortion. That the ward had been determined to be in need of guardianship by reason of mental retardation is not dispositive. A person may be incompetent to make some decisions but competent to make others. *Moe*, 385 Mass. at 567-568. The judge made no specific findings as to incompetency other than the ward's lack of knowledge as to the length of time she had been pregnant. Her other findings, set out in full above, are conclusory. They totally ignore, without explanation, the opinion of the ward's treating neurologist and the psychological evaluations. The ruling of incompetence is also not consistent with the clear statement of the ward and her cogent reason for termination contained in her colloquy with the judge, the tape of which we heard.

The patient's neurologist wrote on September 19, 1991:

> "*I am sure that she is competent to make a decision regarding continuation or termination of her pregnancy.* I know that she is not competent to raise a child alone." (Emphasis supplied.)

The psychological report made in 1989 when the ward was twenty-two indicated that she is of "borderline overall intelligence" and that her responses "suggest that she is in adequate contact with reality and that she perceives the world as others do."

The strength of the reports, particularly that of the neurologist; the borderline nature of the ward's retardation;[8] and her intelligent colloquy with the judge create serious doubt that the judge's threshold determination is supported by the record.

We need not, however, rely on our interpretation of the evidence. Even if we are wrong in concluding that the ward was competent to make her own decision without the need to resort to a substituted judgment, the order must be reversed. As our earlier discussion of *Moe* indicates, the ward's actual preference, even if she is incompetent, is an important part of the substituted judgment determination. Here, despite the ward's clear statements, her treating neurologist's opinion of the medical benefits to the ward of the procedure,[9] and his unequivocal view as to the ward's competency to make the decision, the judge concluded she could not "state with clarity that it would be the ward's substituted judgment to assent to the recommended treatment, i.e., abortion." If the judge, as it seems, required "a high standard of proof" to permit an abortion, such a standard was explicitly repudiated in *Moe*, where the court stated: "The higher standard of proof is invoked when the State seeks to interfere with a person's liberty, not when the individual seeks to exercise his or her liberty." *Id.* at 572. A "high standard of proof . . . would defeat the entire purpose of the proceeding" and "would jeopardize an incompetent's fundamental right to decide whether to bear or beget a child . . . ." *Ibid.*

In the absence of any evidence negating the ward's preference, and in the face of the evidence putting into question the judge's threshold determination of incompetence, we consider that, as matter of law, the judge in applying the substi-

---

[8]Section 4.09 of 104 Code Mass. Regs. (1979), now withdrawn, described five levels of mental retardation (profound, severe, moderate, mild, and borderline). See *Moe*, 385 Mass. at 568 n.8. Those individuals having test scores of 68-83, as does the ward, fall into the borderline category. Such individuals "may or may not be considered as mentally retarded depending on the demands of [their] environment."

[9]The neurologist pointed to the greater difficulties of managing the ward's seizure disorder during pregnancy. See also note 7, *supra*.

tuted judgment analysis gave inadequate weight to the preference of the ward. See *Moe*, 385 Mass. at 570.

The judge's apparent reliance on the absence of a compelling medical reason for the abortion as the basis for her decision is also contrary to the teaching of *Moe*. The opinion specifically rejected requiring a finding that the operation is "medically essential" before authorizing sterilization for an incompetent person. The court said: "Such a rule . . . is the antithesis to our holding today which extends the rights of a competent person to an incompetent person. Rather, we think that the medical necessity for the proposed operation is but one factor to be considered in employing the substituted judgment analysis." *Id*. at 569 n.10.

In summary, we conclude that the judge's threshold determination that the ward was incompetent to make the decision whether to have an abortion is unsupported by the record. Even if the threshold determination was correct and a substituted judgment was called for because of the ward's incompetence, the judge did not apply the substituted judgment doctrine in accordance with the teachings of *Matter of Moe*, 385 Mass. 555 (1982). The guardian's petition should have been allowed.