## IN THE MATTER OF JANE A.

No. 94-P-360.

Suffolk. March 11, 1994. - March 15, 1994.

Present: BROWN, PERRETTA, & KASS, JJ.

*Abortion. Incompetent Person*, Consent to medical treatment. *Probate Court*, Incompetent person, Findings by judge. *Mentally Retarded Person.*

In a guardianship proceeding commenced by the Department of Mental Retardation, this court, applying the substituted judgment doctrine to a Probate Court judge's subsidiary findings, determined that the ward, a thirty year old mentally retarded woman suffering from an adjustment disorder, would choose to terminate her pregnancy by abortion. [238-241]

PETITION filed in the Suffolk Division of the Probate and Family Court Department on January 28, 1994.

The case was heard by *John M. Smoot*, J.

*Donald E. McNamee* for the ward.

*Harold Robertson*, guardian ad litem to oppose a determination that the ward, if competent, would choose to have an abortion.

*Kathleen C. Keville*, temporary guardian with authority concerning medical issues.

*William S. Carroll*, guardian ad litem to investigate and report on the issue of substituted judgment.

KASS, J. Through a petition filed January 28, 1994, for the appointment of a guardian for the ward, the Department of Mental Retardation sought application of the doctrine of substituted judgment for a determination whether Jane, if competent, would choose to terminate her pregnancy by abortion. See *Care & Protection of Beth*, 412 Mass. 188, 194-195 (1992); *Matter of R.H.*, 35 Mass. App. Ct. 478, 484-486 (1993). Based on the subsidiary findings of fact of

the Probate Court judge who heard the case and our study of the entire record, we decide that Jane would choose to abort her eighteen-and-one-half-week pregnancy. In so doing, we reverse the judgment of the Probate Court judge.[1]

We summarize the findings[2] made by the probate judge, supplemented by uncontested facts from the record. Jane is a thirty year old woman who, according to the appointed psychologist, has "moderate mental retardation and . . . an adjustment disorder with mixed emotional features." She has an IQ in the mid-fifties and functions mentally at the level of a three to four year old child, although a four year old would have more cognitive energy for problem solving. Dr. Anne Hurley, whom the court had appointed to examine the ward and who met with her three times, illustrated the extent of the ward's disability by remarking that it would take many years to teach the ward to cook an egg. In addition to her mental retardation, the ward since age six has suffered from seizures. Her seizure disorder is alleviated by daily administration of 200 milligrams of Tegretol and of Primidone.

The ward's condition is marked by a proclivity to agitated and assaultive behavior. This takes the form of hitting, kicking, scratching, biting, and ripping clothes off. During the course of such eruptions the ward has managed to dislocate a shoulder and wrench the joints of staff members in her special residence who were performing the task of trying to calm her. Generally, such outbursts occur when Jane is frustrated in any way, particularly by a break in her routine, e.g., being

---

[1]The judge was conscientious in appointing persons who would examine the question from various points of view. He appointed: a temporary guardian with authority concerning medical issues; counsel for Jane; a guardian ad litem "to investigate and report on the substituted judgment question with respect to the abortion"; a guardian ad litem "to oppose a determination that [the ward], if competent, would choose to have an abortion"; and counsel to represent the fetus. See *Matter of Moe*, 385 Mass. 555, 566-567 (1982). The judge also appointed a psychologist who specialized in the psychiatric aspects of developmental disability to examine and evaluate the ward.

[2]Those findings are detailed and contain helpful references to transcript and exhibits. The judge acted expeditiously in completing his findings and ruling, once the proceedings before him had concluded.

prevented when sick with flu from making a customary trip to a doughnut shop. Such was her rage on that occasion that staff required four-point restraint to manage her until she calmed down.

The ward has been in a variety of special care facilities since age sixteen. Since 1986, she has been living in community programs operated by Vinfen Corporation. She resides in an apartment with three other disabled persons, assisted and watched over by around-the-clock staff.[3] Through intensive effort and a very structured program, Vinfen has enabled Jane to make much progress in controlling her aggressive impulses. Such has been the success of the Vinfen program that, within her restricted circumstances, Jane has a pleasurable life which includes trips to local stores, restaurants, a bank, bowling, movies, parks, the public library, museums, and downtown Boston.

As to her pregnancy, the ward does not seem to understand what that condition means. She varyingly acknowledged and denied that there is a "baby inside me" and stated preferences both to "keep the baby inside my belly" and have the "baby stop growing inside my belly." Efforts to determine Jane's preference about having or not having a baby, the judge found, were "fruitless." As well as hearing testimony from Dr. Hurley, the judge conducted an interview of Jane in chambers, with her counsel, a worker from her residence, and a stenographer present.

In the absence of the ward's capability for an expression of preference, see and compare *Matter of Moe*, 31 Mass. App. Ct. 473, 476-479 (1991), the judge turned to other factors to ascertain the needs and wants of the ward. See *Matter of Moe*, 385 Mass. 555, 565-566 (1982). The family offered no guidance regarding, and on her part there was not adherence to — or consciousness of — a religious faith that might offer clues to the ward's inclinations. The temporary guardian, counsel for the ward, and the guardian ad litem for the ward

---

[3]Although staff are on duty at all times at the residence, we do not mean to say that Jane is or should be under twenty-four hour surveillance. Obviously, she is not; were she, this case would not have arisen.

expressed themselves unequivocally that the ward, who had already complained uncomprehendingly of her morning sickness, would not wish to endure the increasing discomforts, pain, and — for her — terror of childbirth. They uniformly urged that the pregnancy be terminated by abortion.

As he approached his ultimate finding, the judge relied principally on the evidence given by Dr. Hurley, whose testimony occupies more than one-third of the transcript of the entire proceedings. Dr. Hurley said that continuing the pregnancy would undo her observed progress that years of intensive behavioral and educational intervention had achieved.[4] Her "very, very strong" opinion was that continuing the pregnancy would be harmful to Jane psychologically. She anticipated an acute and possibly irretrievable deterioration in the ward's mental condition were the pregnancy allowed to proceed. Dr. Hurley thought there was nothing positive in going through a pregnancy for this individual. The ward had no tolerance for discomfort and, in the past, had reacted to physical or psychological stress by being violent, throwing herself down, destroying property, and attacking others. An abortion, Dr. Hurley further testified, was also not without risk. The uncomfortable and frightening aspects of that procedure might cause the ward to disintegrate into a psychotic state.

With adverse consequences possible no matter which path was taken, the judge wrote that, "before an invasive procedure is authorized, we cannot presuppose that [the ward], if competent, would disregard the fetus as an important factor in her decision." Accordingly, the judge determined, the ward's "decision, if competent, would be not to consent to an abortion."

It is axiomatic that an appellate court accepts the subsidiary findings of fact of a trial judge unless they are clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). To what ultimate legal determination those subsidiary facts add up, however, is a question of law. *Simon* v. *Weymouth Agric.*

---

[4]Dr. Hurley had examined Jane before, in 1985 and 1986.

*& Indus. Soc.*, 389 Mass. 146, 148-149 (1983). *Matter of R.H.*, 35 Mass. App. Ct. at 486. Here the judge found that Jane expressed no coherent or consistent preferences about her pregnancy and the fetus she is carrying. The judge does not mention any other source of evidence, such as a caretaker, on which to base a conclusion that Jane, if competent, would regard the fetus as an important (or dispositive) factor in her decision. Our canvass of the record turned up no such evidence. Indeed, as we have observed, the temporary guardian for the ward and guardian ad litem for the ward testified that the ward would not understand or tolerate, and would not wish to tolerate, the accelerating physical trials of pregnancy and childbirth.

The judge found that, were the pregnancy to proceed, Jane "would probably become very behaviorally disturbed again" and "would probably act out aggressively against staff and others and in so doing jeopardize her own safety and the well being of the fetus." For purposes of reaching his ultimate conclusion, the judge treats as having equal weight his finding, based on Dr. Hurley's testimony, that Jane would suffer psychological harm if she were to undergo an abortion. When the findings do not justify the ultimate conclusion, an appellate court may examine the record to see if there are elements of uncontested evidence that would assist resolution of the question to be decided. See *Bruno* v. *Bruno*, 384 Mass. 31, 35-36 (1981). In saying that there was a possibility of adverse consequence from an abortion, Dr. Hurley offered a crucial qualification: the probability of serious and irreversible harm would be "a thousand fold" greater if the ward proceeded with the pregnancy. An abortion, she thought, was susceptible to careful management, which would minimize the trauma to the ward. Following release by the judge of his findings, Dr. Hurley furnished an affidavit in support of a motion for reconsideration[5] stating that if an abortion were performed under general anesthesia, as she had come to un-

---

[5]That motion was denied.

derstand could be done, the risk of psychological harm to Jane would be greatly reduced.

On the basis of what the judge found and what appears in the record, it follows that the assaults on the ward's fragile mental state from continuation of the pregnancy would be repetitive, for each additional day she is pregnant, and increasing in severity and danger. Normal discomforts of pregnancy such as bladder pressure, an increasingly bulky body,[6] and backache would be felt as unendurable by Jane because she would not fully understand their cause or meaning. From what has been found about Jane's reactions to frustration, changes in her diet to conform with wise prenatal practices might be an occasion for violent encounters. Birth labor would be horrifying and dangerous, again because she could not be prepared for what was happening. In comparison to these difficulties, which would be of an accelerating nature, there is the alternative of one occasion of medical intervention, which can be achieved with a minimum of discomfort and the likelihood of much decreased risk to the ward's psychic makeup. By the very nature of her mental impairment, the ward is self-centered and concerned about how she feels physically, but, in exercising judgment on her behalf, we must take her compassionately as we find her. Only in that way can we determine as best we can the ward's wants, needs, and choices. See *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 750 (1977); *Brophy* v. *New England Sinai Hosp., Inc.*, 398 Mass. 417, 433 (1986); *Care & Protection of Beth*, 412 Mass. at 194-195; *Matter of R.H.*, 35 Mass. App. Ct. at 484-486. That choice would be to end the pregnancy she did not seek, barely begins to understand, and which will increasingly cause her greater discomfort and pain.

The judgment is reversed. A judgment shall be entered that the temporary guardian may authorize medical inter-

---

[6]Historically, Jane had manifested acute anxiety about her physique.

vention to terminate the ward's pregnancy. Our rescript is to issue forthwith.

*So ordered.*