## Guardianship of Brandon.

Bristol. November 5, 1996. - March 13, 1997.

Present: Abrams, Lynch, Greaney, Fried, & Marshall, JJ.

*Department of Mental Retardation. Mental Health. Incompetent Person,*
Consent to medical treatment. *Probate Court,* Incompetent person. *Evidence,* Expert opinion, Judicial discretion. *Practice, Civil,* Judicial discretion, Reconsideration.

Discussion of the nature and function of a substituted judgment hearing, and the factors a judge considers in making a decision to choose or reject medical treatment for an incompetent person [487-488], and statement of the standard of appellate review of such a decision [488].

The standard by which substituted judgment findings authorizing treatment plans should periodically be reviewed is whether there has been a substantial change in circumstances since the time a substituted judgment order was first entered; in the circumstances of a Probate Court judge's review of a proposed treatment plan for an incompetent patient, the judge appropriately weighed the factors considered in the original substituted judgment decision. [488-489]

In a substituted judgment proceeding to review a treatment plan for an incompetent person, the judge's findings clearly indicated that he appropriately applied the substituted judgment standard and considered all the relevant factors in concluding that the person's condition had not substantially changed since the original treatment plan was ordered and that the person would continue to consent to the plan: the judge's conclusion was not clearly erroneous. [489-492]

In a substituted judgment proceeding, the judge did not abuse his discretion in denying a party's motion to reopen the testimony of an expert, who, the judge found, did not have an adequate foundation on which to base his testimony, and any limitation on the amount of time the expert testified had been agreed to among the parties and was not attributable to any action by the judge. [492-494]

In a substituted judgment proceeding the judge acted within his discretion when he required two parties to choose one of their two remaining experts to testify, where he found that those parties had presented the court with unnecessarily duplicative testimony and had improperly prolonged the proceedings and where he determined that the evidence of the remaining experts was cumulative of each other. [494-498]

There was no merit to a claim on appeal from a judge's substituted judgment determination that the judge had failed to consider certain evidence, where the record clearly showed that the judge did consider the evidence and had concluded it was entitled to little weight. [498-499]

CIVIL ACTION commenced in the Bristol Division of the Probate and Family Court Department on June 12, 1989.

The case was heard by *Malcolm Jones*, J., and a motion for reconsideration was heard by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Stan Goldman* for the ward.

*Kristin E. McIntosh*, Assistant Attorney General, for the Department of Mental Retardation.

*Robert A. Sherman* (*Peter F. Carr, II*, with him) for the Judge Rotenberg Educational Center.

LYNCH, J. The appeals by the Department of Mental Retardation (department) and counsel for the ward, Brandon, arise from a Probate Court judge's review of a treatment plan proposed by the Judge Rotenberg Educational Center, Inc. (JRC),[1] for Brandon. The proposed plan, like previous plans authorized for Brandon, included the use of certain "Level III" aversive treatments.[2] The judge entered his findings and an order authorizing the treatment plan on February 10, 1995, after a substituted judgment hearing held over portions

---

[1] Judge Rotenberg Educational Center, Inc. (JRC), was formerly known as the Behavior Research Institute, Inc. (BRI).

[2] Level III aversive therapies are defined by Department of Mental Retardation (department) regulations as "[a]ny Intervention which involves the contingent application of physical contact aversive stimuli such as spanking, slapping or hitting;" "Time Out wherein an individual is placed in a room alone for a period of time exceeding 15 minutes;" "[a]ny Intervention not listed . . . as a Level I or Level II Intervention which is highly intrusive and/or highly restrictive of freedom of movement;" or "[a]ny Intervention which alone, in combination with other Interventions, or as a result of multiple applications of the same Intervention poses a significant risk of physical or psychological harm to the individual." 115 Code Mass. Regs. § 5.14 (3) (d) (1995).

The Level III aversive treatments that were part of the treatment plan proposed by JRC included an electronic shock device, the graduated electronic decelerator-4 (GED-4), and the specialized food program. Patients in the specialized food program are given a daily caloric requirement based on standardized height and weight charts. They do not receive any food except that earned by passing "behavior contracts" which require that the patient not exhibit some or all of his or her target behaviors for a specified period of time. Patients who earn less than their daily caloric requirement are provided "make-up food" in the evening if they receive less than 20% of their caloric requirement during the day. Under the program, a patient could remain on the reduced calorie diet until his or her weight was 87.5% of his or her mid-weight of the desired range.

of five days from October 31, 1994, through December 21, 1994.[3] After the hearing but prior to the judge's issuing his findings, the commissioner of the department sent a letter dated January 20, 1995, to JRC asserting that it was not in compliance with regulations regarding the use of aversive treatments. Because of the alleged noncompliance, the department ordered JRC either to comply with regulations concerning Level III aversive treatments or to modify the treatment plans of six individuals, including Brandon, to exclude the use of Level III aversives.[4] Therefore, after the judge issued his findings and order, the department moved for reconsideration based on its intervening findings of regulatory violations

[3]We note at the outset that the order stated that the treatment plan was to be in effect for twelve months from the date of the order, February 10, 1995, and that the authorization for the administration of the plan would expire eighteen months from the date of the order. The record does not indicate that authorization for the plan has been extended, and technically the order has expired. Because, however, all substituted judgment orders must be periodically reviewed and include a termination date, *Guardianship of Weedon*, 409 Mass. 196, 201 (1991), it is likely that the effective period of the order will be shorter than the period of time necessary to complete the appellate process. See *Commonwealth* v. *Yameen*, 401 Mass. 331, 333 (1987), cert. denied, 486 U.S. 1008 (1988). Therefore, where as here it is clear that for as long as Brandon remains at JRC his treatment plan will continue to need court authorization because it includes aversive therapies, and it is likely that issues regarding Brandon's treatment will reoccur, "there is a significant public interest in clarifying the requirements for review of substituted judgment treatment plans issued by the Probate Court." *Guardianship of Weedon*, supra at 197. See *First Nat'l Bank* v. *Haufler*, 377 Mass. 209, 211 (1979) ("[a]n issue apt to evade review is one which tends to arise only in circumstances that create a substantial likelihood of mootness prior to completion of the appellate process").

We note also that neither the department, JRC, or counsel for Brandon argues on appeal that this case should be dismissed as moot because the order has expired.

[4]According to department regulations, all programs utilizing Level III aversive therapies must be certified by the department. 115 Code Mass. Regs. § 5.14 (4) (f) (1995). The letter conditionally certified JRC but stated that "[t]his certification excludes authorization for [JRC] to continue to use indefinitely Level III interventions for [six] individuals [including Brandon]" and provided that "[JRC] may submit to the [d]epartment a new application for certification to use Level III interventions for any of the [six] individuals." The letter also mandated that, "[i]f, after [thirty] days . . . there is no certification application pending for any of the [six] individuals, then no later than the [thirty-first] day after the date of this letter, [JRC] will begin modifying the behavior modification plan(s) to treatment with Level I and II interventions for the individual(s) from the group

by JRC.[5] After a hearing, the Probate Court judge denied the department's motion. The department and counsel for Brandon appealed from the order authorizing the treatment plan; the department also appealed from the denial of the motion for reconsideration. We transferred the case here on our own motion. We conclude that the judge properly applied the law of substituted judgment and did not erroneously exclude evidence from the hearing and therefore we affirm.

We summarize the facts as found by the judge. At the time of this proceeding, Brandon was an eighteen year old male who had been diagnosed with a seizure disorder, tuberous sclerosis, autism, and a behavior disorder which causes him to engage in aggressive, destructive, "health-dangerous," and noncompliant behavior. Brandon is also profoundly mentally retarded. He became a patient at JRC in 1989.[6]

In November of 1990, all parties agreed that Brandon was in a serious life-threatening condition and that immediate intervention was mandated[7] and use of an electronic shock device, the graduated electronic decelerator (GED), was therefore authorized. The February 26, 1991, order permitted the continued use of the GED. After the use of the GED was originally authorized by the judge, Brandon made great progress, and on March 12, 1992, the judge conducted an extensive evidentiary hearing regarding the GED and concluded that the GED was a "safe and effective device and that there was 'sufficient' and compelling evidence to warrant the reaffirmation of this court's authorization for the (JRC) to employ the

of six for whom [JRC] is not certified to continue to use Level III interventions."

[5]Counsel for Brandon filed a memorandum in support of the department's motion for reconsideration.

[6]On his arrival at JRC, Brandon initially was treated pursuant to a treatment plan authorized on June 15, 1989. That plan was amended several times before permanent substituted judgment findings were entered on February 26, 1991; one such amendment authorized the use of an electronic shock device known as the self-injurious behavior inhibiting system (SIBIS).

[7]The judge entered findings regarding the November, 1990, hearing on March 26, 1991. These findings stated that Brandon's life-threatening behaviors included vomiting and ruminating to the point where Brandon's weight dropped to fifty-two pounds and he had to be hospitalized. After three weeks of graduated electronic decelerator (GED) treatment, Brandon gained twenty pounds and his vomiting and ruminating behaviors were dramatically reduced. Brandon was then removed from restraints and was able to manipulate a computer.

GED device" as part of Brandon's treatment plan. By the early summer of 1992, however, Brandon's behavior had deteriorated; his cheeks were swollen and "bitten," his lips were swollen, his knuckles were bare, and he was gouging his skin. Thus, on June 11, 1992, the judge authorized JRC to treat Brandon's five major behavior problems with a stronger GED device known as the GED-4. Following the introduction of the GED-4, Brandon's behavior improved dramatically until May of 1994, when Brandon began to suck and bite on his cheeks. This behavior was so severe that eventually a hole developed in his cheek from which fluids and food leaked. While JRC was at first reluctant to apply the GED-4 to Brandon with more frequency for fear he would habituate to the device, in the fall of 1994, JRC began to use the GED-4 each time Brandon engaged in this behavior. The hole in Brandon's cheek then healed.

During the treatment plan review, the judge heard from a number of witnesses, including Brandon's mother, Brandon's former case manager, and the monitor appointed by the court to oversee Brandon's treatment. In addition, the judge heard from numerous experts. The judge found that two psychologists called by the department lacked an adequate foundation to testify about Brandon; one of the psychologists, the judge found, had no familiarity with the use of contingent electric shock to control problematic behavior and only observed Brandon for one hour before forming her opinion. Counsel for Brandon also called a psychologist. He testified that Brandon "looks better than I've ever seen him look" and concurred that Brandon's present program had been successful in reducing Brandon's problematic behavior. Moreover, the witness could not offer any specific recommendations for change in the JRC plan which were within his area of expertise.

The judge concluded that, at the present time, Brandon was not in any form of restraint and had "advanced significantly in his communication skills as well as his self-care skills." Moreover, "[h]is aggression has decreased dramatically to the point where his biting behavior, which was problematic at his admission, is at a zero level." The judge therefore determined that "there has been no substantial change in [Brandon's] condition and circumstances since the judgment of June 1992" amending the treatment plan of Feb-

ruary 26, 1991, and authorizing the GED-4 treatment, and he entered the treatment plan proposed by JRC as a court order.[8]

*Discussion.* The function of a substituted judgment hearing is to secure to incompetent persons the same right to choose or reject treatment that is accorded to competent persons by the law of consent. *Superintendent of Belchertown State Sch.* v. *Saikewicz,* 373 Mass. 728, 745 (1977). Thus, in a substituted judgment hearing, a judge attempts to decide "what decision [regarding treatment] would be made by the incompetent person if he or she were competent" (citations omitted). *Guardianship of Roe,* 411 Mass. 666, 673 (1992) (hereinafter *Roe I*), quoting *Matter of Moe,* 385 Mass. 555, 565 (1982). See *Superintendent of Belchertown State Sch.* v. *Saikewicz, supra* at 752-753. Factors to be considered include the patient's expressed preferences regarding treatment, the patient's religious convictions, the impact of the decision on Brandon's family, the probability of adverse side effects, and the prognosis for the patient with and without treatment. *Guardianship of Roe,* 383 Mass. 415, 444 (1981) (hereinafter *Roe II*). Moreover, any factor particularly unique to an individual is essential to the proper exercise of substituted judgment, for the decision must "give the fullest possible expression to the character and circumstances of that individual." *Id.,* quoting *Superintendent of Belchertown State Sch.* v. *Saikewicz, supra.*

---

[8]Brandon's treatment has also been affected by ongoing litigation between JRC and the department, and it is unclear whether currently there is authorization to treat Brandon with the GED-4. Following the January 20 letter, which required JRC either to comply with department regulations or to modify Brandon's treatment plan to exclude the use of Level III aversives, a single justice of the Appeals Court entered an order referencing the January 20 letter and stated that "any changes in treatment that do not require changes in treatment plans, including but not limited to cessation of the treatments [including the use of the GED-4 on Brandon after thirty days] do not require prior approval of the Court in substituted judgment proceedings." This order was later clarified, however, to specify that JRC was enjoined from using "automatic negative reinforcement with electric shock, programmed multiple applications of electric shock, the specialized food program, and behavior rehearsal lessons using Level III interventions," and it would appear that this clarification enjoined the use of the GED-4 without any conditions or limitations. See *Judge Rotenberg Educ. Ctr., Inc.* v. *Commissioner of the Dep't of Mental Retardation (No. 3), ante* 473, 474 & n.4 (1997).

Because a substituted judgment order seeks to give expression to an individual's unique wants and needs, the order "is valid because it is based on the demands of a patient's current circumstances." *Guardianship of Weedon*, 409 Mass. 196, 200 (1991). Therefore, we have recognized that treatment plans are not to be effective indefinitely. *Id.* Indeed, in light of the fact that a patient's current circumstances might change, "all substituted judgment treatment orders must provide for periodic review of the treatment plan and of the patient's circumstances in order to ensure the appropriateness of the plan and the careful protection of the patient's rights." *Id.* at 201. Such periodic reviews are necessary in order to "determine if [Brandon's] condition and circumstances have *substantially changed*" so that Brandon, if competent, would no longer consent to the treatment previously authorized (emphasis added). *Id.* at 200, quoting *Rogers* v. *Commissioner of the Dep't of Mental Health*, 390 Mass. 489, 507 (1983).

In reviewing the judge's determination that Brandon's circumstances have not substantially changed and that Brandon, would, if competent, continue to consent to the proposed treatment plan, we must consider whether "the facts on the record support the proposition that [Brandon] himself would have made the decision" if he were competent. *Superintendent of Belchertown State Sch.* v. *Saikewicz, supra* at 753 (discussing appellate review of original substituted judgment determination). The judge's subsidiary findings of fact are accepted unless they are clearly erroneous. The legal conclusion to be drawn from those facts is a question of law. See *id.*; *Matter of Jane A.*, 36 Mass. App. Ct. 236, 239 (1994).

1. *Standard by which substituted judgment findings authorizing treatment plans should periodically be reviewed.* Counsel for Brandon argues that the substantial change in circumstances standard is not appropriate in substituted judgment cases and that there must be a de novo review of treatment plans. We disagree.

Our decision in *Guardianship of Weedon, supra,* made clear that periodic reviews of substituted judgment orders should be used to "determine if [Brandon's] condition and circumstances have *substantially changed*" since the time a substituted judgment order was first entered, and we see no reason to depart from this rule (emphasis added). *Id.* at 200, quoting *Roe II, supra.* Indeed, contrary to the argument of Brandon's

counsel, a patient's current circumstances can be adequately evaluated through an examination of any substantial changes that have occurred since the original substituted judgment hearing. While it is true that the June 11, 1992, order amending the February 26, 1991, treatment plan and authorizing the use of the GED-4 did not make any specific finding regarding whether Brandon would consent to the use of the GED-4, it is clear that the judge recognized that the decree was amending Brandon's treatment plan; that plan authorized the use of the GED and the judge made specific findings that it was Brandon's substituted judgment to be treated with such a plan. Thus, implicit in the order of June 11, 1992, made after the judge conducted a hearing, is the judge's conclusion that Brandon would consent to treatment with the GED-4. Moreover, it is clear that, in the instant case, in determining whether Brandon's condition had substantially changed, the judge appropriately weighed the factors considered at the original substituted judgment hearing, and made extensive written findings concerning all of these factors.

2. *The adequacy of the judge's findings.* Counsel for Brandon argues that, in reviewing the treatment plan for Brandon, the judge erred in his application of the substituted judgment doctrine because he did not properly consider the experimental nature of the GED-4 device, which is a stronger version of the GED, and which counsel for Brandon asserts is the most powerful and thus most painful electric shock device ever designed for use on humans.[9] Counsel for Brandon argues that Brandon, if competent, would choose to be treated by less painful and less experimental treatment if not in a life-threatening condition. Therefore, counsel for Brandon seeks modifications on the use of the GED-4 on Brandon, arguing that such modifications would result in fewer, more effective applications of the device.[10]

It is true, of course, that treatment authorized in substituted

---

[9] All parties appear to concede that Brandon was the only person in the world, at least at the time of trial, treated with the GED-4.

[10] In counsel for Brandon's proposed treatment plan, submitted on the last day of testimony, counsel for Brandon proposed that the use of the GED-4: (1) be limited to certain clearly defined behavior, to be selected by the JRC clinician; (2) that the treatment with the GED-4 be charted separately, accurately measuring its effectiveness; and (3) the number of shocks administered be limited to an absolute number of fifty per twenty-

judgment proceedings must comport with accepted professional practice. *Matter of McKnight*, 406 Mass. 787, 801 (1990). In the instant case, the judge found that the GED-4 comports with accepted psychological principles. This conclusion was based, as the judge noted, on "considerable testimony with regard to the GED-4 device as it is presently used at JRC and particularly how it is used in treating Brandon." Indeed, in addition to the testimony of the court monitor appointed to oversee the implementation of Brandon's treatment plan that the use of the GED-4 is based on accepted psychological principles, numerous articles regarding the use of electric shock therapy were admitted in evidence, and JRC introduced in evidence charts comparing all known shock therapy literature. The judge also noted that "[e]lectric shock therapy as a treatment in an aversive behavior plan has already been litigated by this [c]ourt, and the [c]ourt finds that no new testimony presented at this hearing should alter the prior approval of the [c]ourt."

While there was some disagreement among various experts regarding the efficacy of the GED-4, the judge had the benefit of, and was entitled to consider, evidence of Brandon's improvement since being treated with the GED and the GED-4. *Roe II, supra* at 448 ("professional opinion may not always be unanimous regarding the probability of specific benefits being received by a specific individual upon administration of a specific treatment. Both of these factors — the benefits sought and the degree of assurance that they actually will be received — are entitled to consideration"). Specifically, the judge noted that Brandon is no longer in "any form of restraint. Brandon has advanced significantly in his communication skills as well as his self-care skills. He enjoys a full life which includes numerous field trips, swimming, roller skating, and other activities. He has advanced significantly in his toilet training to the point where he is not in diapers and is able to indicate when he needs to go to the bathroom. Brandon is able to dress himself with prompts and feed himself with utensils with minimal prompting. His aggression

four-hour period. It was urged that the specialized food program be eliminated from the treatment plan, so as to better assess the effectiveness of the primary treatment modality, the GED-4. Finally, it was requested that certain corollary procedures for use with the GED-4 be deleted from the treatment plan as they had not been previously used with Brandon.

has decreased dramatically to the point where his biting behavior, which was problematic at his admission, is at a zero level." Moreover, the judge concluded that Brandon's prognosis under the treatment plan is for a continuation of the progress which he had made in the areas of education, socialization, and positive life experiences.[11] See *Roe II, supra* at 447-448 ("the greater the likelihood that there will be cure or improvement, the more likely an individual would be to submit to intrusive treatment accompanied by the possibility of adverse side effects").

The judge's findings also make clear he appropriately gave significant weight to the potential pain the device might cause Brandon. See *id*. at 447 (in considering probability of adverse side effects, judge must consider "the severity of these side effects, the probability that they would occur, and the circumstances in which they would be endured"). The parties had stipulated that, with the exception of the potential for burns and transient pain, there were no adverse physical effects from the GED-4, and the judge found that, in Brandon's case, except for some evidence that Brandon's skin would occasionally become red or irritated and, on rare occasions, a slight scabbing would occur, "[t]here is no evidence of any adverse physical side effects from the proposed treatment." Moreover, the judge found that, "[w]hile the device certainly emits significant pain, the pain has to be evaluated in light of the pain which Brandon already inflicts upon himself, as well as the potential for even greater pain and self-injury which would follow in the event that the treatment plan were discontinued." Finally, while counsel for Brandon argues that Brandon would not choose to be treated with a device that causes such pain absent a life-threatening condition, the judge appropriately considered that, without such treatment, Brandon might *regress* to a life-threatening state of self-abuse and other primitive behavior. See *Rogers* v. *Commissioner of the Dep't of Mental Health*, 390 Mass. 489, 507 (1983) ("[i]t is probable that most patients would wish to avoid a steadily worsening condition").

We conclude that the judge's findings clearly indicate that

[11]The record reflects that the judge had Brandon come to the courtroom so that the judge could observe him; the judge noted that his observation of Brandon revealed that the indentation in Brandon's cheek caused by his sucking behavior had almost completely healed.

he appropriately applied the substituted judgment standard and considered all of the relevant factors in determining that Brandon's condition had not "substantially changed" since the GED-4 had been authorized and that Brandon would continue to consent to the treatment plan.[12] Indeed, it is clear that the judge did not ignore that the use of the GED-4 was not without problems; in a portion of his order entitled "Comment," he stated that "[t]he [c]ourt is concerned with regard to the possibility that Brandon may habituate to the GED-4 device and his inappropriate, health dangerous or self-abusive behavior should increase. The [c]ourt, based on all the testimony, would be reluctant to approve the use of any device utilizing a higher degree of electrical shock." After hearing all the evidence, however, the judge concluded that Brandon would still consent to the treatment plan proposed by JRC, and that conclusion was not erroneous.

3. *Evidentiary issues.* The department and counsel for Brandon argue that the judge abused his discretion by arbitrarily imposing time limits on the testimony of expert witnesses, refusing to allow one expert witness to testify, and refusing to accept an offer of proof regarding the testimony of an expert witness. Moreover, counsel for Brandon argues that improperly limiting the evidence was particularly egregious where the instant proceeding was the first full evidentiary hearing on the use of the GED-4 that resulted in a judgment approving its use. We disagree.

*Limiting expert testimony.* The department and counsel for Brandon argue that the judge abused his discretion by improperly limiting the testimony of an expert in the field of

---

[12]While our discussion focuses on the probability of adverse side effects and the prognosis for Brandon with and without treatment, the judge noted that Brandon, who is not verbal, "is not capable of expressing his preferences with regard to treatment, and there is no evidence of a religious conviction which would preclude utilizing the treatment plan proposed by JRC including the use of the GED-4 device." The judge also noted that Brandon's mother continues to consent to the treatment plan and found that Brandon's family would be adversely affected if Brandon's treatment under JRC's treatment plan was not continued. Thus, the decision regarding Brandon's substituted judgment turned on a consideration of the remaining factors. *Guardianship of Roe,* 383 Mass. 415, 448 (1981) (judge must analyze relative weight of findings in particular case).

psychology.[13, 14] The expert had come "some distance" to testify. On the day he was scheduled to testify, however, the judge could not begin hearing testimony in this matter until 3 P.M. Therefore, prior to the expert's testimony, the parties agreed that the time remaining before court would be adjourned for the day, one hour, would be split with counsel for Brandon and the department each receiving fifteen minutes and counsel for JRC receiving thirty minutes. It was further agreed that counsel for JRC would not object to leading questions posed to the witness. The parties examined the expert pursuant to this arrangement and the witness was dismissed. Later, however, the department moved, assented to by counsel for Brandon, to reopen the expert's testimony. That motion was denied. The department argues that the witness's testimony was critical to a fair and balanced evaluation of the treatment plan proposed by JRC because he was prepared to testify that certain parts of the treatment plan proposed by JRC did not comport with clinical practice and that the judge abused his discretion in only allowing the witness to testify for one hour.

It is true that "arbitrary imposition of time limits on witnesses' testimony" thwart the purpose of a trial. *Chandler* v. *FMC Corp.*, 35 Mass. App. Ct. 332, 338 (1993). The department's argument ignores, however, that the judge never imposed a time limit on the expert's testimony. Indeed, it was the parties themselves who came up with the agreement regarding the format of the expert's testimony.[15] While originally the agreement was reached when it was anticipated that the time remaining before court adjourned would be two

---

[13]The testimony of the expert was offered by the department but counsel for Brandon, in joining the department's argument on appeal, argues that his testimony was critical to Brandon's argument that the GED-4 should not be used in the manner proposed by JRC.

[14]Counsel for Brandon also suggests that Brandon was prejudiced because his witness would have had "more useful testimony" if he had been allowed to testify longer. This argument is without merit. Indeed, counsel for Brandon stated that he had "no further questions" for the witness and never objected to the dismissal of the witness.

[15]In denying the motion to reopen the expert's testimony, the judge stated that, "[i]f counsel had wanted to continue with [the expert's] testimony, then counsel could have had [him] back at this time. But the counsel having agreed to the procedure with regard to direct and cross on that occasion concerning [the expert], the motion to reopen his testimony is going to be denied."

hours, not one, neither side expressed any objection to the plan when it was explained to the judge with one hour remaining in the court day, nor did anyone object at the conclusion of the witness's testimony. This is not a case of an arbitrary imposition of a time limit on testimony that prevents parties from presenting their entire case but rather the parties themselves imposed time limits on the testimony and made no objection following the conclusion of the expert's testimony. See *id.* at 338-339. Moreover, in disallowing the department's motion to recall the expert, the judge was well within his discretion, particularly where, as here, he found that, while the expert did possess credentials with respect to the administration of electric shock, "it was apparent to the [c]ourt that [the expert] lacked an adequate foundation on which to present his testimony" regarding Brandon.[16] Cf. *Commonwealth* v. *Hicks*, 375 Mass. 274, 276 (1978) ("[w]hether or not a witness should be recalled in a criminal case is a matter entrusted to the sound discretion of the trial judge"); *Wells* v. *Wells*, 209 Mass. 282, 291 (1911) ("[i]t was for the judge to decide whether he would reopen the case to allow further evidence to be taken"); *Urban Inv. & Dev. Co.* v. *Turner Constr. Co.*, 35 Mass. App. Ct. 100, 104 (1993) (decision regarding presentation of rebuttal evidence within judge's substantial discretion).

The department and counsel for Brandon also argue that

---

[16]In concluding that the expert lacked an adequate foundation on which to base his testimony, the judge stated that he "had not seen [Brandon] and was only provided with a portion of the applicable records concerning [Brandon]. He failed to interview [Brandon's] mother, the JRC case manager, and the supervising psychologist." The judge further found that, "[i]n spite of a lack of foundation, [the expert] was willing to present broad opinions concerning the JRC's treatment plan. [The expert] conceded the obvious ethical problems with presenting testimony without an adequate foundation."

Moreover, while the department points out that the guardian ad litem stated that "[w]e have done an injustice by not having the benefit of what [the expert] might have contributed," we note that the record makes clear that the guardian ad litem was objecting to the fact that the expert "was done an injustice in being subjected to this proceeding" in light of the fact that it appeared the department "was invited to consider the opportunity of inviting [the expert] to the institute so that he might have the opportunity to examine [Brandon] and make such examination on grounds as he saw fit to transact his professional opinion making" but that the department "saw fit to decline that" invitation.

the judge improperly ordered that they choose one of two remaining expert witnesses to testify.[17] It was decided by counsel for Brandon and the department that Brandon's psychologist would testify, effectively precluding the other from testifying. The department then attempted to introduce in evidence a report authored by the other psychologist in lieu of his testimony. The judge refused to accept the report as an exhibit, and the department requested that the report be accepted as an offer of proof regarding what the other psychologist's testimony would have been if he had been permitted to testify.[18] The judge appeared to accept the report as an offer of proof but would not allow the report to be read into the record.[19] See note 22, *infra*. The department again sought to introduce the report when the judge ordered the department to submit an alternative treatment plan for Brandon pursuant to an outstanding order of the court; the

[17]The judge stated, "[Y]ou've got two other psychologists on this list. I'll let you have one. You decide which one you want and that is directed to both counsel for [Brandon] and counsel for the [d]epartment." We note that, despite this order, three expert witnesses called by the department were allowed to testify.

[18]In refusing to accept the report as an exhibit, the judge stated that there was a standing pretrial order issued on February 26, 1988. Under that order, department clinicians were to conduct clinical evaluations of each JRC patient and prepare a report which was to be forwarded to all parties. The department had previously named a psychologist as the department clinician who was slated to provide an independent evaluation of Brandon; by the fifth day of testimony, however, no report had been submitted. Thus, when the department moved to submit the report, the judge refused to admit the report at that late stage of the trial.

We note that, while the department does not address the issue, it appears that the judge was well within his discretion in refusing to allow the report in evidence because the department violated a previous order of the court in failing promptly to give copies of the report to all parties. Cf. Mass. R. Civ. P. 37 (b) (2) (b), 365 Mass. 797 (1965) (appropriate sanction for failing to comply with discovery order is exclusion of designated matters).

[19]The judge stated that he was "a bit concerned with the format of an offer of proof. It's been my understanding that an offer of proof would allow for the report to be read into the record and I'm not going to allow that to happen. An offer of proof being something that this particular witness would, his testimony would be, if allowed to testify or the report I suppose speaks for itself. So [on] technical grounds I'm going to accept it as an offer of proof. I will file it. So it will be in the file. If at the [a]ppellate level it needs to be addressed on a remand, if that should happen, the [c]ourt has the report in the file. But I'm not treating it technically as an offer of proof."

judge refused to accept the report as an alternative treatment plan.[20]

"The ascertainment of facts having probative force on the issues, nothing more, and nothing less, is the whole object of a trial in court." *Chandler* v. *FMC Corp.*, 35 Mass. App. Ct. 332, 338 (1993), quoting *Goldman* v. *Ashkins*, 266 Mass. 374, 379 (1929). Thus, parties cannot be restricted from presenting their cases. *Goldman* v. *Ashkins, supra* at 380. A trial judge, however, has an obligation to be "the directing and controlling mind at the trial." *Whitney* v. *Wellesley & Boston St. Ry.*, 197 Mass. 495, 502 (1908). "An important part of the judge's function is to ensure that the trial always moves forward, without needless consumption of time and 'without repetitions and without diversions into collateral or disconnected matters.' " *Chandler* v. *FMC Corp., supra* at 338, quoting *Goldman* v. *Ashkins, supra.* Moreover, trial judges have "broad discretion to make . . . evidentiary rulings conducive to the conduct of a fair and orderly trial . . . [and] [w]ithin this discretion lies the power to exclude or deny expert testimony. . . ." *Nally* v. *Volkswagen of Am., Inc.*, 405 Mass. 191, 197 (1989), quoting *Campbell Indus.* v. *M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980). See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 482 (1991).

In the instant case, the judge was well within his discretion when he required the department and counsel for Brandon to choose one of two remaining experts to testify. Indeed, during the trial, the judge noted that the treatment plan review had "gone out of hand," and in his findings, the judge concluded that "[i]t therefore became necessary to limit testimony" only after he concluded that "cross-examination by [c]ounsel for [the department] and [Brandon] was unnecessarily lengthy and [c]ounsel for [Brandon] and [the department] acted in

---

[20]In his findings of fact and conclusions of law, the judge stated that "the [d]epartment improperly attempted to submit a hearsay report to the [c]ourt." Moreover, the judge found that "the [c]ourt, several times during the course of the proceedings, inquired of both counsel [for Brandon] and counsel for the [department] as to where their alternative treatment plan was. Both counsel . . . submitted alternative treatment plans on the last day of testimony after the luncheon recess. The [department's] plan was handwritten on yellow paper and counsel for [Brandon] submitted a typed plan. This was only done after the [c]ourt ordered counsel to produce such plans on the last day of hearings."

concert in presenting the [c]ourt with duplicative testimony."[21] Given these findings, which are supported by the record, we conclude that the judge was well within his discretion in refusing to permit another psychologist to testify. Because the offer of proof is not properly before us we have no basis to conclude that the defendants have been harmed by the ruling. *Letch* v. *Daniels*, 401 Mass. 65, 70 (1987) ("purpose of an offer of proof is to show an appellate court that the proponent had been prejudiced by the exclusion of offered evidence"). See Mass. R. Civ. P. 43 (c), 365 Mass. 806 (1974).[22] Furthermore, it is clear from the record that the other psychologist was going to critique the treatment plan proposed by JRC and offer alternative treatment options for Brandon. The department had already presented two psychologists and one psychiatrist, all of whom held doctorates in their fields, in opposition to the proposed treatment plan, and counsel for Brandon presented the testimony of a psychologist, also with a doctorate in psychology. The judge did not abuse his discretion in concluding that the testimony of yet another psychologist would be cumulative.[23] See

[21]The judge also stated that the department's conduct in this case "was improper and resulted in an unnecessarily prolonged proceeding. [The department] presented duplicative testimony from witnesses who had limited or incomplete information concerning [Brandon]."

[22]We note also that while the judge indicated that the report would be "in the file" we can find no evidence of the report in the record appendix. It is each party's responsibility to ensure that material necessary to its appeal is included in the appendix. Mass. R. A. P. 18 (a), as amended, 409 Mass. 1602 (1991). The index to the record appendix lists almost one hundred documents contained therein only by exhibit number, but nowhere in their briefs does the department or counsel for Brandon reference the report by exhibit number. References in the briefs to parts of the record reproduced in an appendix shall be to the pages of the appendix at which those parts appear, Mass. R. A. P. 16 (e), as amended, 378 Mass. 940 (1979). Absent such a reference we are unwilling to search for the document and conclude that the report is not part of the record appendix. Moreover, we note that exhibits are to be suitably indexed, Mass. R.A.P. 18 (e), as amended, 392 Mass. 1106 (1984), and where, as here, the exhibits encompass approximately 1,000 pages and the portions of the transcript reproduced also encompass almost 1,000 pages, merely indexing exhibits by number is not helpful.

[23]While the department also argues that it offered the report as an alternative treatment plan, they make no argument regarding why the report should have been accepted as such other than to state that the psychologist who authored the report would have testified as to alternative treatments

*Anthony's Pier Four, Inc.* v. *HBC Assocs.*, *supra* ("[i]t is also within the discretion of the judge to exclude excessively cumulative evidence, including expert testimony"); *Doherty's Case*, 10 Mass. App. Ct. 880, 881 (1980) (no error in refusing to allow employee to introduce testimony of witness where no offer of proof made and for all that appears on record testimony of witness would have been cumulative). Moreover, we are reluctant to conclude that the report should have been accepted as an offer of proof given the judge's conclusion, which is not contested on appeal, that the report itself should have been provided to all parties earlier in the proceedings. Cf. *Nally* v. *Volkswagen of Am., Inc.*, 405 Mass. 191, 197 (1989), quoting *Campbell Indus.* v. *M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1990) (trial judge has discretion to make discovery rulings to ensure party not unfairly prejudiced).

*Consideration of a supplemental affidavit.* Counsel for Brandon also argues that the judge erred in failing to consider the supplemental affidavit submitted by the psychiatrist who testified for the department, containing his recommendation that certain medications could be beneficial to Brandon and would reduce the number of aversive stimuli necessary to control his behavior.[24] In short, counsel for Brandon argues that the failure of the judge to address all viable treatment modalities is an improper application of the doctrine of substituted judgment. This argument is without merit for the record clearly shows that the judge considered the psychiatrist's affidavit. For example, the affidavit stated that the psychiatrist would recommend "starting with a trial of Benzodiazepine, namely Klonopin. This was chosen based on the apparent success of a trial of another Benzodiazepine, Ativan." The judge, however, concluded that the data relied on by the psychiatrist in support of his recommendation that the drug Klonopin be used to treat Brandon's behavior did not

for Brandon. In any event, the judge did accept alternative treatment plans from the department and counsel for Brandon on the last day of trial after repeatedly inquiring of the two parties where their alternative treatment plans were. Thus, neither party can show that any prejudice results from the failure of the judge to accept the report as an alternative treatment plan.

[24]The department, JRC, and counsel for Brandon, however, agreed that the psychiatrist and another witness would each submit a report on Brandon and be cross-examined but that there would be no direct examination of the witness.

support his conclusions. The judge found that "[t]he JRC records show that in 1992, when Brandon was on a drug similar to Klonopin (Ativan), his behaviors were essentially the same (or even lower) after the drug was discontinued. [The psychiatrist] conceded that he had not consulted the more detailed daily charts maintained by JRC to examine any relationship between Klonopin and any decrease in Brandon's behaviors. He conceded that he could not testify to any [causal] relationship between the Ativan and any decrease in behavior." Thus, while the judge did not make specific findings regarding all of his recommendations, it is clear that he considered the psychiatrist's opinion in reaching his conclusions, and had determined that the psychiatrist's opinion was entitled to little weight. It is undisputed that a judge may accord the weight he chooses to expert testimony. *Commonwealth* v. *Hawkesworth*, 405 Mass. 664, 671-672 (1989) (experts' opinions are not binding on the trier of fact, who may accept or reject them in whole or in part); *Dewan* v. *Dewan*, 30 Mass. App. Ct. 133, 135 (1991) ("[i]t is, of course, common currency, that a judge faced with conflicting expert evidence, may accept or reject all or parts of the opinions offered").

4. *Motion for reconsideration.* Finally, the department argues that the judge erred as a matter of law when he denied the department's motion for reconsideration of the court order approving a treatment plan in light of the department's intervening findings that the JRC was not in compliance with department regulations. By doing so, the department argues that the judge impermissibly infringed on the functions of the executive branch and nullified all regulatory authority of the department with respect to JRC by authorizing treatment that was otherwise illegal. JRC, in opposing the department's motion, argued that, based on a settlement agreement between the department and JRC, only the judge had the authority to approve treatment procedures.

*The settlement agreement.* The settlement agreement authorizes a judge, through substituted judgment proceedings, to make the ultimate determination regarding whether an individual would consent to the use of certain aversive treatments. *Judge Rotenberg Educ. Ctr., Inc.* v. *Commissioner of the Dep't of Mental Retardation (No. 1), ante* 430 (1997). We have also, however, concluded that the settlement agree-

ment did not strip the department of all its regulatory authority over JRC. *Id.* at 445. Thus, the judge cannot authorize the use of aversive treatments to occur at a facility that is not certified. *Id.* at 446.[25]

If a program or an agency is decertified subsequent to a substituted judgment order or in the intervening time between the hearing of the evidence and the issuance of findings and orders, the proper procedure would be, as was done in this case, for the department to move for reconsideration. In such a proceeding, the moving party would have to establish that decertification was a result of the proper exercise of the department's authority and not a subterfuge adopted to nullify the judge's order.[26] In the instant case, however, we need not consider whether the judge erred in denying the motion to reconsider in light of the letter of January 20, 1995, which decertified JRC to use aversive treatments for six individuals, including Brandon, because the letter has been rescinded by the receiver appointed to manage the department, and we have concluded that the appointment of the receiver was appropriate. *Id.* at 464.[27] Thus, the question whether the judge acted improperly in light of the letter of January 20, 1995, is moot.

The judge's order is affirmed.

*So ordered.*

---

[25]The judge clearly recognized that certification of JRC's program was necessary to his approval of JRC's proposed treatment plan, for he specifically stated that "JRC is certified by the Department of Mental Retardation to utilize the GED-4." In addition, the judge noted that there had been testimony that the plan proposed by JRC was "the most effective, least restrictive plan available for Brandon."

[26]We note that, in the instant case, in denying the motion for reconsideration, the judge stated that "the [d]epartment cannot by implementation of its certification process subvert . . . the jurisdiction of the [c]ourt to render substituted judgment determinations on a case by case basis."

[27]JRC moved to supplement the record appendix pursuant to Mass. R.A.P. 18, as amended, 417 Mass. 1602 (1994). The department and counsel for Brandon moved to strike the supplemental appendix filed by JRC which contained the letter sent by the receiver to JRC rescinding the letter of January 20, 1995. JRC's motion is allowed; the motion of the department and counsel for Brandon is denied.