NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

21-P-1047                                           Appeals Court

GUARDIANSHIP OF C.A.


No. 21-P-1047.

Bristol.      October 11, 2022. – March 15, 2023.

Present:  Sacks, Hand, & Grant, JJ.


Guardian, Incompetent person, Consent to medical treatment.
     Incompetent Person, Consent to medical treatment.  Probate
     Court, Incompetent person.  Mental Health.  Practice,
     Civil, Guardianship proceeding.


     Petition for appointment of a guardian filed in the Bristol
Division of the Probate and Family Court Department on December
13, 2018.

     The case was heard by Richard J. McMahon, J.


     Ilse Nehring for C.A.
     Cassandra Bolanos, Assistant Attorney General, for the
Department of Mental Health.


     GRANT, J.  After a trial, a judge of the Probate and Family

Court found the respondent, C.A., to be an incapacitated person,

and entered a decree and order pursuant to G. L. c. 190B,

§ 5-306, appointing a limited guardian to make medical

decisions.  The guardian was further authorized to consent to and monitor the administration of antipsychotic medication to C.A. according to a treatment plan, pursuant to G. L. c. 190B, § 5-306A, and Rogers v. Commissioner of Dep't of Mental Health, 390 Mass. 489, 504 (1983).  That treatment plan authorized the administration of Zyprexa, the medication that C.A. had been taking, and authorized administration of "alternative medications" if Zyprexa "no longer benefits" her.  C.A. appeals, arguing that there was insufficient evidence that she is an incapacitated person and that the judge erred in concluding that, if C.A. were not incapacitated, her substituted judgment would be to consent to the administration of antipsychotic medication.  C.A. further argues that, to the extent that the judge's order authorized the administration of alternative medications including Invega and Latuda, it was premature.  We conclude that the judge did not have sufficient evidence to determine that C.A.'s substituted judgment would be to accept Invega or Latuda, and we vacate so much of the April 30, 2021 decree and order as authorized the administration of those two drugs.  We affirm the remainder of the decree and order.

Background.  The Department of Mental Health (DMH) petitioned the Probate and Family Court for appointment of a guardian to make medical decisions (among others) and for substituted judgment (Rogers) authorization to treat C.A.

involuntarily with antipsychotic medication in accordance with a treatment plan. The petition sought approval of a treatment plan to administer Zyprexa, and also sought authority to administer the alternative antipsychotic medications. Through counsel, C.A. objected to the petition.

Based on the evidence at the January 2021 trial, the judge found as follows. At the time of trial, C.A. was seventy-eight years old and had a diagnosis of paranoid schizophrenia. For the previous eight years, C.A. had lived on her own in an apartment, and was able to meet her own basic self-care needs, such as bathing and dressing herself, preparing her own meals, and using public transportation to go grocery shopping and to medical appointments.

The main issue at trial was, as the judge phrased it, whether C.A. had "the capacity to self-monitor the administration of antipsychotic medications."[1] The judge credited the testimony of C.A.'s psychiatrist, Dr. Lucyna Czarnota-Dolliver, that when she began treating C.A. in 2008, C.A. was taking Zyprexa for paranoid schizophrenia, and that the condition was "well-controlled." As of trial, C.A. was taking

---

[1] As discussed below, the judge's consideration of C.A.'s "capacity to self-monitor" encompassed not only her taking the medications, but also her ability to understand their benefits and side effects and to monitor for those side effects.

thirty milligrams of Zyprexa Zydis by mouth daily at bedtime.[2]
Dr. Czarnota-Dolliver testified that Zyprexa may cause side
effects including high glucose levels, high cholesterol,
increased blood pressure, weight gain, and involuntary movements
including tremors.  The doctor testified that when she
recommended that C.A. undergo blood tests to monitor for those
conditions, C.A. refused, insisting that she did not have high
blood pressure or high cholesterol.  The judge credited the
clinician's affidavit of Dr. Czarnota-Dolliver, which was
admitted in evidence without objection.[3]  In it, the doctor
opined that C.A. had "limited ability to fully participate in
[an] informed consent decision discussion" and "[d]ifficulties
manipulating the information to make an informed decision"; the
doctor also testified to that opinion.

C.A. testified that she did not have a mental illness.
Asked if she was taking medication, she replied that she was,

---

[2] Zyprexa Zydis is a form of the drug administered orally.
As discussed below, Zyprexa also may be administered by
intramuscular injection.

[3] See G. L. c. 190B, § 5-306A (a) ("When approving and
authorizing an antipsychotic treatment plan by order or decree,
the court shall consider the testimony or affidavit of a
licensed physician . . . regarding such plan").  See also
Guardianship of A.R., 99 Mass. App. Ct. 349, 354 (2021) ("A
medical certificate affidavit may be used at the time of the
final determination of incapacity in the limited circumstances
when counsel for the incapacitated person does not object to its
use").

but that she did not know who prescribed it.  C.A. offered no explanation for her refusal to be monitored for the possible side effects of Zyprexa.[4]

The judge appointed the guardian for the limited purpose of making medical decisions for C.A. and monitoring "the ongoing administration of antipsychotic medication and other medications," and authorized the Rogers treatment plan which permitted continued administration of Zyprexa orally and by a different modality, intramuscular injection.  The treatment plan also permitted administration of two alternative antipsychotic medications:  Invega, administered either orally, by intramuscular injection monthly, or by intramuscular injection every three months; or Latuda, administered orally.[5]  The judge set forth his findings of fact, rationale, and conclusions of law.  C.A. filed a timely notice of appeal.

Discussion.  In this context, to meet the standard for appointment of a guardian with Rogers authority, DMH was

---

[4] Before trial, C.A.'s counsel had asserted in an affidavit of objection that C.A. objected to the guardianship petition on the grounds that "she does not like the potential for side effects and does not feel the medications are necessary."  C.A. did not testify to those reasons at trial.

[5] The judge referred to them as "five (5) alternative medications," counting injectable Zyprexa as a different drug from Zyprexa taken orally, and counting separately each of the three ways Invega could be administered.  We consider them to be two alternative antipsychotic medications:  Invega and Latuda.

required to prove by a preponderance of the evidence that C.A. was an incapacitated person within the meaning of G. L. c. 190B, §§ 5-101 (9), 5-306, and that, if she were not incapacitated, C.A. would choose to be treated by antipsychotic medication. See Guardianship of A.R., 99 Mass. App. Ct. 349, 353, 358 (2021); G. L. c. 190B, § 5-306A.  We review the judge's ruling for abuse of discretion or other error of law.  See Guardianship of Linda, 401 Mass. 783, 786-787 (1988).

1.  Incapacitated person.  C.A. argues that the evidence was insufficient to support the judge's finding that she was an incapacitated person.  Specifically, C.A. contends that the judge (1) applied the wrong legal standard by conflating the statutory definition of an incapacitated person with the common-law test for competency to give informed consent; (2) improperly relied on the doctor's testimony that C.A. had refused to undergo blood testing to monitor for the side effects of Zyprexa; (3) should have found, based on evidence that C.A. was able to live independently and care for herself, including by taking Zyprexa, that C.A. was not an incapacitated person; and (4) improperly considered facts not admitted in evidence.  We consider each of those issues in turn.

a.  Definition of incapacitated person.  As defined in G. L. c. 190B, § 5-101 (9), an "incapacitated person" is

> "an individual who for reasons other than advanced age or minority, has a clinically diagnosed condition that results in an inability to receive and evaluate information or make or communicate decisions to such an extent that the individual lacks the ability to meet essential requirements for physical health, safety, or self-care, even with appropriate technological assistance."

In concluding that C.A. was an incapacitated person, the judge cited to that statute and closely paraphrased that definition. Simply because the judge sometimes used the words "competency" and "capacity," which was the terminology in cases that predate the adoption of § 5-101 (9), see St. 2008, c. 521, § 9, does not mean that the judge applied the incorrect definition of an incapacitated person.[6]

b. Refusal to undergo blood testing. C.A. argues that the judge improperly relied on C.A.'s refusal to undergo blood testing as the basis of his finding that C.A. was an incapacitated person. The record shows that the judge did not rely solely on C.A.'s refusal to undergo blood testing, but also on her inability to have a meaningful discussion with her doctor on the subject. The judge credited information from Dr. Czarnota-Dolliver's affidavit and testimony that C.A. was unable

---

[6] C.A. cites to the District Court Standards of Judicial Practice: Civil Commitment and Authorization of Medical Treatment for Mental Illness (rev. Apr. 2019), which pertain to commitment proceedings pursuant to G. L. c. 123. Those standards are not pertinent here, and the judge did not cite to them.

to participate in a discussion about the need to monitor her blood for side effects of Zyprexa in order to make an informed decision whether to continue that medication. The judge also credited Dr. Czarnota-Dolliver's testimony that under her care C.A. had been taking Zyprexa successfully since at least 2008. The evidence of Dr. Czarnota-Dolliver's opinion that C.A. was unable to fully participate in the discussion about testing for side effects of Zyprexa in order to make an informed decision on that issue allowed the judge to find that C.A. was an incapacitated person within the meaning of G. L. c. 190B, § 5-101 (9), for the limited purpose of making medical decisions. See Guardianship of A.R., 99 Mass. App. Ct. at 356-357 (treating psychiatrist's testimony sufficed to show that schizophrenic person was incapacitated).

Also in evidence was C.A.'s own testimony, in which she denied that she had any mental illness. Asked about her medications, C.A. said, "I take medication. They changed it. . . . I don't know who prescribed it." That contrasted with Dr. Czarnota-Dolliver's testimony that she had been C.A.'s treating psychiatrist since 2008, seeing C.A. about every two months, and that since then C.A. had been successfully treated with Zyprexa. The judge had a first-hand view of C.A.'s apparent inability to understand and appreciate the nature of her mental illness and the possible side effects of her

prescribed medication.[7]  The judge's assessment of both witnesses' testimony is entitled to deference.  See Guardianship of Jackson, 61 Mass. App. Ct. 768, 774 (2004).

Put in terms of the three-part definition of "incapacitated person" set out in G. L. c. 190B, § 5-101 (9), (1) C.A. had a "clinically diagnosed condition"; (2) that condition resulted in her "inability to receive and evaluate information" regarding her mental health treatment, its potential side effects including high blood pressure and high cholesterol, and the appropriate monitoring for such side effects; and (3) therefore C.A. "lack[ed] the ability to meet essential requirements for physical health," such as engaging in and cooperating with such monitoring.  The appointment of a limited guardian for the purpose of making medical decisions was warranted.

c.  Incapacitation despite living independently.  Contrary to C.A.'s argument, her ability to live independently and attend to most of her own needs, including taking her Zyprexa, did not preclude the judge from finding that she was an incapacitated person within the meaning of G. L. c. 190B, § 5-101 (9), and

---

[7] The transcript shows that while Dr. Czarnota-Dolliver was testifying about C.A.'s schizophrenia diagnosis and the side effects that her medication may cause, C.A. interrupted repeatedly, stating that she did not have schizophrenia or high blood sugar, until the judge cautioned C.A.'s counsel about the interruptions.

appointing a limited guardian.  Simply because C.A. could perform many of the tasks of everyday living did not preclude the judge from finding that she was incapacitated from making decisions about her medical treatment, including treatment with antipsychotic medication.  "A judge may adjudicate a person to be competent to make some decisions, but not others" (quotation and citation omitted).  Guardianship of Roe, 411 Mass. 666, 670 (1992).

The judge found that "[w]hile [C.A.] shows great strength in managing her daily routine and self-care . . . she lacks the ability to understand that the medication she takes is for a mental health condition," and as a result "is unable to manage all the tasks required for keeping up her anti-psychotic medication."  Those tasks, as Dr. Czarnota-Dolliver explained, included monitoring for the side effects of Zyprexa.

d.  Facts not in evidence.  Finally, as to C.A.'s claims that the judge made findings based on information not in evidence, most of them lack merit.  Contrary to C.A.'s argument, the judge's finding that paranoid schizophrenia "is a disorder that affects a person's ability to think clearly" was based on Dr. Czarnota-Dolliver's testimony that C.A. had "fog disorganization" and "difficulty processing information."  Similarly, the judge's finding that C.A. had been refusing treatment necessary to monitor her blood pressure was derived

from Dr. Czarnota-Dolliver's testimony about C.A.'s inability to engage in a discussion about the need for her to undergo testing to monitor for the side effects of Zyprexa.

As C.A. points out, the judge made findings about certain possible side effects of antipsychotic medications that are not supported by the record before us.[8] In addition, the judge made findings that C.A. had had prior psychiatric hospitalizations, but testimony about those hospitalizations had been stricken on C.A.'s hearsay objections. Those errors did not materially contribute to the judge's ultimate conclusions that DMH had met its burden (1) for appointment of a limited guardian, based on evidence including Dr. Czarnota-Dolliver's testimony about C.A.'s inability to engage in a meaningful discussion about monitoring for the side effects of Zyprexa; and (2) for the entry of a Rogers order, based in part on Dr. Czarnota-Dolliver's opinion that if C.A. did not continue taking antipsychotic medication C.A. would decompensate and require psychiatric hospitalization in the future. See Guardianship of A.R., 99 Mass. App. Ct. at 356-357 (even without considering

---

[8] Those side effects mentioned by the judge include low blood pressure, cessation of menses, changes in skin pigmentation, eye problems, and toxicity to the heart, liver, or bone marrow. The judge did hear testimony from Dr. Czarnota-Dolliver that a different antipsychotic medication that C.A. had taken previously had caused C.A. to suffer permanently from the side effect of tardive dyskinesia. That medication was not among those listed in the treatment plan.

contested exhibits, record contained sufficient evidence to support limited guardianship).

2. Substituted judgment. C.A. argues that the judge erred in determining pursuant to G. L. c. 190B, § 5-306A, that if C.A. were not incapacitated, her substituted judgment would be to accept the administration of antipsychotic medication. She contends that the judge's substituted judgment determination was "premature" because it was "predicated on hypotheticals" that she would refuse Zyprexa or that it would no longer benefit her.

The relevant factors a judge must consider in making a substituted judgment determination include "(1) a person's expressed preferences; (2) h[er] religious convictions; (3) the impact on [her] family; (4) the probability of adverse side effects from treatment; (5) h[er] prognosis with treatment; and (6) h[er] prognosis without treatment." Guardianship of A.R., 99 Mass. App. Ct. at 358. See Guardianship of Roe, 383 Mass. 415, 444 (1981). Because the incapacitated person's circumstances may change, a substituted judgment treatment order authorizing the administration of antipsychotic medication must contain a termination date and provisions for monitoring by the guardian (or other suitable person) and periodic review at least annually by a judge.[9] See G. L. c. 190B, § 5-306A (b), (c). The

_____

[9] We note that the treatment plan at issue has expired. As a result, C.A.'s appellate challenge to the substituted judgment

treatment plan should clearly describe the authorized treatment and dosage ranges, any procedures or treatments that may be used to counteract potential side effects, and reasonably foreseeable alternative treatments.

In reviewing the judge's determination that C.A. would, if not incapacitated, consent to treatment by antipsychotic medication, "we must consider whether the facts on the record support the proposition that [C.A.] [her]self would have made the decision if [s]he were competent" (quotation and citation omitted).  Guardianship of Brandon, 424 Mass. 482, 488 (1997).  See G. L. c. 190B, § 1-109.  We accept the judge's findings of fact unless clearly erroneous, but review de novo the legal conclusions to be drawn from those facts.  See Guardianship of Brandon, supra.

a.  Zyprexa.  Applying the factors set forth above, the judge had ample basis to conclude that C.A., if not incapacitated, would consent to taking the antipsychotic medication Zyprexa daily as set forth in the proposed treatment plan.  C.A. had been voluntarily taking Zyprexa in its orally administered form, Zyprexa Zydis, by ingesting it daily for at least the past twelve years.  DMH's filing of the petition was

component of the decree is now moot.  See Guardianship of A.R., 99 Mass. App. Ct. at 357.  Because the issue of a treatment plan is likely to reoccur in this case, we nevertheless consider whether it was properly imposed.  See id.

precipitated by C.A.'s inability to engage in a discussion with Dr. Czarnota-Dolliver about the need to undergo blood tests to monitor for the side effects of Zyprexa; shortly before trial, C.A. refused to undergo those basic blood tests. C.A. testified that she did not believe she was mentally ill and did not know who had prescribed the medication she was taking; that contrasted with evidence that she had been seeing Dr. Czarnota-Dolliver for a dozen years during which her paranoid schizophrenia was successfully treated with Zyprexa. C.A. expressed no religious beliefs in opposition to being treated with Zyprexa, and her family was not involved in her care and did not oppose its use. Crediting Dr. Czarnota-Dolliver's opinion, the judge concluded that C.A.'s prognosis with antipsychotic medication was "good[,] with ability to remain safely in a community setting," while her prognosis without that medication was "poor[,] with decompensation and inpatient hospitalization."

i. Absence of evidence that C.A. refused Zyprexa. Just because C.A. had not yet refused to take Zyprexa did not preclude the judge from exercising his discretion to approve the treatment plan authorizing administration of Zyprexa in the event that she did.[10] In Guardianship of Linda, 401 Mass. at

_____

[10] Dr. Czarnota-Dolliver testified without objection that C.A. "never refused [Zyprexa] until recently. She was always

784-785, the respondent, like C.A., suffered from paranoid schizophrenia, was living independently, and had been accepting treatment with antipsychotic drugs but did not understand the nature of the drugs. Anticipating that the respondent might start refusing to take the drugs, DMH sought an order that would permit forcible medication if she did so. See id. at 785. Construing a prior statute, G. L. c. 201, § 6, repealed by St. 2008, c. 521, § 21, a Probate and Family Court judge denied DMH's request to give the respondent's guardian Rogers authority to require the respondent to accept antipsychotic drugs. See Guardianship of Linda, supra at 784, 786. The Supreme Judicial Court held that the judge acted within his discretion in ruling that the hypothetical possibility that the respondent might in the future refuse to take antipsychotic drugs was not a sufficient basis to compel treatment with the drugs. See id. at 786-787.

More than two decades after Guardianship of Linda, the Legislature adopted the Massachusetts Uniform Probate Code, including the statutes at issue here, G. L. c. 190B, §§ 5-101 (9), 5-306, and 5-306A. See St. 2008, c. 521, § 9,

---

compliant, but this week, I got a phone call that she started refusing." The judge did not find whether he credited that testimony, and in fact found that C.A. "is currently accepting Zyprexa Zydis [thirty] mgs at bedtime." Because the judge did not explicitly credit the evidence that C.A. had begun refusing Zyprexa, we do not consider it.

eff. July 1, 2009.  That was a "substantial revision" to Massachusetts' "statutory guardianship law," more precisely defining incapacitation and establishing "more elaborate reporting requirements for guardians."  Guardianship of D.C., 479 Mass. 516, 522 (2018).  One purpose underlying the adoption of the new guardianship statutes was "the ability to create a limited guardianship . . . intended to maximize the liberty and autonomy of a person subject to guardianship."  Guardianship of B.V.G., 474 Mass. 315, 323 (2016).  General Laws c. 190B, § 5-309 (a), furthers that purpose by requiring that the guardian "shall exercise authority only as necessitated by the incapacitated person's mental and adaptive limitations, and, to the extent possible, shall encourage the incapacitated person to participate in decisions, to act on h[er] own behalf, and to develop or regain the capacity to manage personal affairs."  If the condition changes so that the incapacitated person becomes "capable of exercising rights previously limited," the guardian "shall immediately notify the court."  G. L. c. 190B, § 5-309 (a).

In Guardianship of Linda, 401 Mass. at 787, the court noted that "[i]t is possible that in another case the evidence could be such that the judge might appropriately determine prospectively that antipsychotic drugs might be administered even if the ward refused the treatment."  This is just such a

case.  From the evidence of C.A.'s apparent confusion about her medication, the judge could infer that C.A. was at risk of stopping Zyprexa, which would result in the decompensation that Dr. Czarnota-Dolliver predicted.  The judge did not have to wait for those events to occur before appointing the Rogers guardian with authority to consent to treating C.A. with Zyprexa.  That is particularly so because G. L. c. 190B, § 5-309 (a), required C.A.'s guardian to encourage C.A. to participate in decisions and to develop the capacity to manage her own affairs, and imposed on the guardian an affirmative duty to inform the judge immediately if C.A. became capable of doing so.  We conclude that the judge did not abuse his discretion in approving the Rogers treatment plan permitting the guardian, in the event that C.A. refused Zyprexa, to consent on C.A.'s behalf to continuing to take it.  By giving the guardian that authority, the judge furthered the statutory purpose of "encourag[ing] the development of maximum self-reliance and independence of [C.A.]," G. L. c. 190B, § 5-306 (a).  See Guardianship of B.V.G., 474 Mass. at 322-323.  Permitting the guardian to consent on C.A.'s behalf to Zyprexa, the medication she had been taking for years, allowed C.A. to continue to live independently rather than face the alternative, if she stopped taking it, that she would decompensate and face the prospect of hospitalization.

ii. <u>Administration of Zyprexa by intramuscular injection</u>. Nor do we discern an error of law or abuse of discretion in the judge's ruling to permit administration of Zyprexa by the alternative modality of intramuscular injection. In describing the benefits and risks of the drug, Dr. Czarnota-Dolliver referred to it as "Zyprexa," without specifying the orally administered form, "Zyprexa Zydis," and from that the judge could infer that essentially the same benefits and risks applied to the drug taken either way.[11] Implicit in the judge's conclusion that C.A.'s substituted judgment would be to consent to administration of Zyprexa orally was his conclusion that C.A.'s substituted judgment would be to consent to Zyprexa by a different modality, intramuscular injection. See <u>Guardianship of Brandon</u>, 424 Mass. at 489 ("implicit" in judge's finding that patient's substituted judgment would be to consent to treatment with electronic shock device was conclusion that, if effectiveness diminished, patient would consent to treatment with stronger such device). Cf. <u>Guardianship of L.H.</u>, 84 Mass. App. Ct. 711, 716-717 (2014) (judge properly allowed modification of treatment plan to permit administration of drug by injection rather than orally). We do not read the

---

[11] C.A. does not identify how any of the criteria set forth in <u>Guardianship of A.R.</u>, 99 Mass. App. Ct. at 358, would apply differently if Zyprexa were administered by intramuscular injection rather than orally.

substituted judgment standard set forth in G. L. c. 190B, § 5-306A, to be so rigid as to require a separate substituted judgment determination before a judge may authorize treatment with the same drug by means of a different modality. See Guardianship of Weedon, 409 Mass. 196, 202 (1991) ("it is essential that the Probate Court maintain its flexibility and its consequent ability to respond to the individual needs of patients").

Dr. Czarnota-Dolliver explained that she did not prescribe medications to be administered by injection on an outpatient basis, so that alternative would be necessary only if C.A. refused to take Zyprexa orally, decompensated, and was admitted to a psychiatric hospital. Just because those events had not yet occurred did not preclude the judge from exercising his discretion to approve the treatment plan authorizing Zyprexa to be administered by the alternative modality of intramuscular injection. Permitting the guardian to consent to continuing C.A.'s treatment with Zyprexa administered by intramuscular injection would minimize the risk that she would decompensate, and prevent a lapse in treatment. We discern no abuse of discretion in the judge's interpreting G. L. c. 190B, § 5-306A, to permit him to authorize the treatment plan including administration of Zyprexa to C.A. by intramuscular injection.

b.  Alternative antipsychotic medications.  C.A. argues
that the judge erred in authorizing the treatment plan
permitting the guardian to consent to the administration of the
alternative antipsychotic medications, Invega and Latuda.  We
conclude that because the judge did not hear evidence of those
medications' side effects or effectiveness, he did not have a
sufficient basis to determine that C.A.'s substituted judgment
would be to accept either of those medications.

As to those two alternative medications, Dr. Czarnota-
Dolliver testified that "if there's a problem with one
medication, then we try another," and "let's say if she were not
doing well on Zyprexa and then I gave her Invega and she would
develop some kind of allergic reaction, then we would have
another option [Latuda] to choose from."  But the judge did not
hear evidence as to what side effects Invega or Latuda,
specifically, might cause, or those drugs' effectiveness.  Thus,
as to Invega and Latuda, the judge did not perform the parts of
the substituted judgment analysis that required him to consider
"the probability of adverse side effects from treatment," and
C.A.'s "prognosis with treatment" by those drugs.  Guardianship
of A.R., 99 Mass. App. Ct. at 358.

DMH argues that Probate and Family Court Standing Order 4-
11 (1) (c) (2011) provides DMH with the authority to offer
hypothetical alternative antipsychotic medications listed in the

treatment plan.  This argument is unavailing, as that standing order applies only to "uncontested" motions to extend existing Rogers treatment plans.  At issue here was an initial Rogers petition, which C.A. did contest.  In those circumstances, the judge was required to conduct a substituted judgment determination for each of the proposed alternative medications, Invega and Latuda.

We vacate so much of the treatment plan order as authorized the administration of Invega or Latuda as alternative medications.

Conclusion.  So much of the decree and order dated April 30, 2021, as authorizes the treatment of C.A. with Invega or Latuda is vacated.  In all other respects the decree and order is affirmed.

So ordered.